## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS AT KANSAS CITY

| | |
|---|---|
| In re<br><br>JOHN Q. HAMMONS FALL 2006, LLC, *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 16-21142 (RDB)<br>*Jointly administered* |
| THE REVOCABLE TRUST OF JOHN Q. HAMMONS DATED DECEMBER 28, 1989 AS AMENDED AND RESTATED;<br><br>        Plaintiff,<br><br>vs.<br><br>JWJ HOTEL HOLDINGS INC. f/k/a AJJ HOTEL HOLDINGS, INC.; MIKE KAMMERER, in his capacity as CO-MANAGER OF W&H REALTY, LLC; and W&H REALTY, LLC;<br><br>Defendants. | Adversary Proceeding No. 18-6055 |

### EMERGENCY MOTION FOR ORDER (I) GRANTING A TEMPORARY RESTRAINING ORDER AND THEREAFTER A PRELIMINARY INJUNCTION TO ENJOIN THE DEFENDANTS FROM FURTHER PROCEEDINGS IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO; (II) DIRECTING THAT PROSECUTION OF SUCH LITIGATION VIOLATES § 362(a)(3) OF THE BANKRUPTCY CODE; (III) DIRECTING THAT PROSECUTION OF SUCH LITIGATION VIOLATES THE PLAN INJUNCTION; (IV) ENFORCING THE AUTOMATIC STAY AGAINST THE DEFENDANTS; AND (V) ENFORCING THE PLAN INJUNCTION AGAINST THE DEFENDANTS

COMES NOW the Revocable Trust of John Q. Hammons dated December 28, 1989, as amended and restated (the "JQH Trust" or Plaintiff") and hereby files this Motion requesting that on an emergency basis, the Court: (i) enter an order and thereby temporarily restrain JWJ Hotel Holdings Inc. f/k/a AJJ Hotel Holdings, Inc. ("AJJ"), Mike Kammerer, in his capacity as Co-Manager of W&H Realty, LLC ("Kammerer"), and W&H Realty, LLC ("WHR" and collectively

with AJJ and Kammerer, the "Defendants") from proceeding in the United States District Court for the Southern District of Ohio (the "Ohio District Court") for up to fourteen days and, prior to the expiration of the temporary restraining order; (ii) issue a temporary restraining order and thereafter, a preliminary injunction to enjoin the Defendants from further proceedings in the Ohio District Court, pending further order of this Court; (iii) rule that prosecution of the pending litigation in the Ohio District Court violates § 362(a)(3) of the Bankruptcy Code; (iv) rule that prosecution of the pending litigation in the Ohio District Court violates the plan injunction entered by this Court on May 11, 2018; (v) enforce the automatic stay against the Defendants to prevent their continuing attempts to exercise of control over property of the JQH Trust's bankruptcy estate; and (vi) enforce the plan injunction against the Defendants.  In support thereof, the JQH Trust states the following:

## INTRODUCTION

1. On June 26, 2016, the JQH Trust and seventy five of its affiliates filed Chapter 11 bankruptcy petitions.

2. The Court has jurisdiction of this motion pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) in that it, *inter alia*, concerns the administration of the estate and affects the liquidation of the assets of the estate.  Moreover, the Court has exclusive jurisdiction of this motion pursuant to 28 U.S.C. § 1334(e) because it seeks entry of an order preventing the Defendants from exercising control over property of the estate.

3. Under the terms of the Confirmation Order (defined below), this Court retained jurisdiction "over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XII of the Plans and section 1142 of the Bankruptcy Code."  Confirmation Order at 40.  The motion also seeks entry of order preventing the

141356438.6

Defendants from violating the injunction entered by this Court in the Confirmation Order. Confirmation Order at 37-38.

4. Contemporaneously with the filing of this Motion, the Debtors commenced the above captioned adversary proceeding by filing their verified complaint against the Defendants (the "Complaint").

5. Venue is appropriate pursuant to 28 U.S.C. § 1409(a).

6. As detailed herein and in the Complaint, the relief requested herein is necessary to prevent Defendant AJJ from continuing to violate the automatic stay and Plans Injunction (defined below) by seeking to deprive Debtor JQH Trust of its right to co-manage WHR and to prevent AJJ from taking actions that will harm the value of WHR and the JQH Trust's interest therein. In the Ohio District Court action, AJJ has sought the appointment of a receiver to sell a property owned by WHR and to cause WHR to enter into long-term development agreements despite the fact that the JQH Trust has repeatedly stated that it does not wish to pursue these actions. Without the relief requested herein, the JQH Trust faces a substantial risk of irreparable harm through AJJ's actions.

## BACKGROUND

7. The history and factual background are set out in the Complaint verified by Greggory D. Groves and are adopted and incorporated herein by reference.

### A. The JQH Trust Bankruptcy Estate's Interest in WHR

8. In the 1950s, John Q. Hammons recognized a growing need for quality hotels throughout the country. As a successful real estate investor and developer, Mr. Hammons had the experience and knowledge required to achieve his ambitions. In 1958, he partnered with Roy Winegardner, and the two purchased ten Holiday Inn hotel franchises. Hammons and

Winegardner went on to found Winegardner and Hammons, Inc. ("WHI") and developed a total of 67 Holiday Inn hotels. A separate entity, W&H Realty, Inc. ("W&H"), was formed in 1993 to hold the real estate interests developed by WHI.

9. At the time of Winegardner's death on September 30, 2009, Winegardner and Hammons (through the JQH Trust) each owned approximately 45% of the shares of WHI and W&H. Eric J. Kamjford owned the remaining 10% of shares in WHI and W&H. Following Winegardner's death, his 45% interest in WHI and W&H passed to his trust and subsequently to the REW Trusts. Kamjford later transferred his 10% ownership of shares in WHI and W&H. As a result, the REW Trusts' and JQH Trust's respective shares of ownership in WHI and W&H each increased to 50%.

10. On June 26, 2016, the JQH Trust and seventy-five of its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of Title11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court (the "Bankruptcy Cases"). As a result, the JQH Trust's ownership interests in WHI and W&H became property of the JQH Trust's bankruptcy estate pursuant to § 541(a) of the Bankruptcy Code.

11. The ownership interest in WHI and W&H became the JQH Trust's ownership interest in WHR as a result of this Court's approval of a restructuring of WHI and W&H (the "WHR Restructuring"). As a result of the WHR Restructuring, defendant AJJ and the JQH Trust each now own 50% of WHR.

12. As the Court held at a hearing on May 14, 2018, the JQH Trust's ownership interest in WHR remained property of the JQH Trust's bankruptcy estate following the WHR Restructuring. Transcript of May 14, 2018 Hearing, attached as Exhibit A to the Complaint ("May 14 Transcript"), 70:25-71:6.

4

### B. The JQH Trust's Rights Under the Operating Agreement

13. As part of the WHR Restructuring, on May 18, 2017, the JQH Trust and AJJ executed the First Amended and Restated Operating Agreement of W&H Realty, LLC (the "Operating Agreement"), a true and correct copy of which is attached as Exhibit B to the Complaint.

14. The Operating Agreement provides that all of the business and affairs of WHR shall be exclusively managed by the "two Co-Managers of the Company" and further provided as follows:

> There shall always be two (2) Co-Managers, one (1) Co-Manager representing the then holder(s) of the JQH Membership Interest (the "**JQH Co-Manager**"), and the other single Co-Manager representing the then holder(s) of the AJJ Holdings Membership Interest (the "**AJJ Holdings Co-Manager**").

Exhibit B at § 9.1.

15. As of May 18, 2017, Ms. Dowdy was the initial JQH Co-Manager and Mike Kammerer was the initial AJJ Holdings Co-Manager.

16. Under the terms of the Operating Agreement, Ms. Dowdy served as the JQH Co-Manager "until the first to occur of her death, resignation or incompetence." Exhibit B at § 9.1.

17. The Operating Agreement provides the following procedure to replace Ms. Dowdy as the JQH Co-Manager upon, *inter alia*, her resignation:

> At such time as [Ms. Dowdy] ceases to serve as the JQH Co-Manager, her successor(s) shall be a then JQH Co-Trustee unless and until another person(s) is appointed by the then JQH Co-Trustee(s). In the event that there is more than one JQH Co-Trustee, then such JQH Co-Trustees shall jointly appoint a single individual to be the JQH Co-Manager.

Exhibit B at § 9.1.

18. Thus, upon Ms. Dowdy's resignation, the JQH Co-Trustees have the exclusive power, and the complete discretion, to appoint any individual as the successor JQH Co-Manager.

19. Furthermore, the Operating Agreement does not provide AJJ or Mr. Kammerer with any right to advise on, consent to, approve or disapprove of, the successor JQH Co-Manager.

### C. The Settlement and Plans Transactions Between the Debtors and JD Holdings, L.L.C.

20. On February 13, 2018, the Debtors filed a Motion for Authority to Enter Into Plan Support Agreement with JD Holdings, L.L.C. and Compromise of Claims (the "Settlement Motion") (ECF Doc. 1791). The Settlement Motion sought to settle numerous, multi-year disputes between the Debtors and JD Holdings, L.L.C. ("JD Holdings") to clear the way for JD Holdings to acquire substantially all of the Debtors' assets, pay in full all allowed claims in the bankruptcy cases (totaling more than $1 billion) and subordinating JD Holdings' own allowed claim of more than $495 million.

21. One of the assets owned by the JQH Trust to be transferred to JD Holdings under the settlement (and the confirmed plan of reorganization discussed below) is the JQH Trust's 50% membership interest in WHR.

22. On February 27, 2018, AJJ entered its appearance in the bankruptcy cases (ECF Doc. 1847) and filed its Limited Response to Debtors' Motion for Authority to Enter Into Plan Support Agreement (the "AJJ Settlement Objection") (ECF Doc. 1848). In the AJJ Settlement Objection, AJJ objected to any "[d]elegation by Debtor Trust to JDH of any additional approvals or closing documents required to close any of the WHR Projects [discussed below] prior to plan confirmation." AJJ Settlement Objection at 3.

23. On February 28, 2018, the Court held a hearing on the Settlement Motion. AJJ appeared and argued the issues raised in the AJJ Settlement Objection. The Bankruptcy Court overruled the AJJ Settlement Objection and entered its Order Granting Motion For Authority to Enter Into Plan Support Agreement and Compromise of Claims (the "Settlement Order") (ECF

6

Doc. 1856).

24. On March 30, 2018, JD Holdings filed its Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for all Debtors Filed by Creditor JD Holdings, L.L.C. (the "Plan") (ECF Doc. 1946). The Plan provides for the transfer of the Debtors' assets to JD Holdings free and clear of all liens and claims. *See* Plan at 19.

25. The Plan further provides for an exculpation and release of the Defendants as follows:

> Except as otherwise specifically provided in the Plans, **no Exculpated Party shall be responsible or have any liability for, and each Exculpated Party is hereby released and exculpated from, any claim, Cause of Action, duty, obligation, liability, damage, loss, cost or expense for (i) any act taken or not taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Disclosure Statement, Plans, Confirmation, Plans Transactions, the Plans, or any Plan Documents or other agreement, document, instrument or release created or entered into in connection with the Plans**; (ii) any act taken or not taken in connection with, or related to, the negotiation of Cure Costs; (iii) any act taken or not taken in connection with, or related to, the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases; or (iv) **any other prepetition or post-petition act taken or not taken in connection with, or related to, the restructuring of the Debtor**, except for (A) willful misconduct (including fraud), (B) the rights of any Entity to enforce the Plans and the Plans Documents, or (C) the rights of any Entity to enforce any Final Order, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties, responsibilities and obligations under the Plans or any Final Order"

Plan at Art. VIII.E (the "Plan Exculpation") (emphasis added).

26. On April 13, 2018, AJJ filed its Objection to the Plan (the "AJJ Plan Objection") (ECF. Doc. 2015). In the AJJ Plan Objection, AJJ raised no objection to the Plan Exculpation.

27. On April 27, 2018, the Court held a hearing to consider confirmation of the Plan. AJJ appeared and argued the issues raised in the AJJ Plan Objection. The Court granted confirmation of the Plan and, on May 11, 2018, entered its Corrected Order Confirming Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for all Debtors

7

Filed by Creditor JD Holdings, L.L.C. ) (the "Confirmation Order") (ECF Doc. 2188).

28. AJJ reviewed the Confirmation Order before it was submitted to the Court and did not object. AJJ elected not to appeal the Confirmation Order.

29. The Confirmation Order provides for a delay in the transfer of certain assets, including but not limited to the JQH Trust's interest in WHR. In the event that transfer of an asset is delayed, the Confirmation provides: "[i]n such case, all economic benefits and interests from such Delayed Asset shall inure to the benefit of JD Holdings pending such closing on the Delayed Assets." Confirmation Order at 23.

30. Specifically, with respect to the disputes with AJJ over transfer of the JQH Trust's interest in WHR, the Confirmation Order provided as follows:

> At such time as the Revocable Trust of John Q. Hammons dated December 28, 1989, as amended and restated ("Debtor Trust") advises AJJ of the mechanism or procedure by which it intends to transfer the Debtor Trust's interests in WHR to JD Holdings LLC or its designee ("JDH"), AJJ reserves all rights to dispute such mechanism or procedure, including, but not limited to, asserting their right to purchase the Debtor Trust's Interests in WHR under the WHR Operating Agreement and/or the failure of such mechanism or procedure to comply with the WHR Operating Agreement.

Attachment to Corrected Order Confirming Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for all Debtors Filed by Creditor JD Holdings, L.L.C. (the "Confirmation Order Supplement") (ECF Doc. 2231).

31. Pursuant to the Confirmation Order, JD Holdings was authorized to acquire substantially all of the JQH Trust's assets, including the WHR Interest. The Confirmation Order further provided JD Holdings with the ability to delay closing on the acquisition of certain assets, including the JQH WHR Interest. Confirmation Order at 7(b).

32. The Confirmation Order enjoins actions against the Defendants as follows:

> Except as otherwise expressly provided in the Plans or this Order, ***all Entities or Persons who have held, hold, or may hold Claims or Equity Interests*** that have

8

been released pursuant to the Plans or this Order, discharged pursuant to the Plans and this Order, *or are subject to exculpation pursuant to the Plans or this Order are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors, JD Holdings, or the Sale Lender, in its capacity as such: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities or Persons on account of, in connection with, or with respect to any such Claims or Equity Interests*; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or Persons or the property or estates of such Entities or Persons on account of, in connection with, or with respect to any such Claims or Equity Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or Persons or against the property or estates of such Entities or Persons on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Entity or Person has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Entity or Person asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (v) *commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plans*.

Confirmation Order at 37-38 (emphasis added) (the "Plan Injunction").

33. The Effective Date under the Plan occurred on May 17, 2018. *See* Notice of Occurrence of Effective Date (ECF Doc. 2238).

### D. The WHR Projects

#### 1. The Chicago Marriott Sale

34. On October 3, 2017, Mike Conway, in his capacity as President of WHR, sent an email to Ms. Dowdy informing her of WHR's intent to list for sale with CBRE the Marriott hotel that WHR owned in or around the city of Chicago, Illinois (the "Chicago Marriott"). That request was made by email (the "October 3 Email"), the relevant text of which states:

Before I sign the listing agreement CBRE I wanted to ensure you are OK with us proceeding with listing the hotel for sale.

9

**Please call if you have any questions and please let me know if you have objection to us moving forward with listing the hotel for sale by next Wednesday, October 11.**

October 3 Email, attached as Exhibit C to the Complaint, at 1.

35.  In response to Mr. Conway's request for permission to list the Chicago Marriott, on October 4, 2017, Ms. Dowdy responded as follows:  "It's fine with me.  Jacquie."  Exhibit C at 1.

36.  While Ms. Dowdy agreed to list the Chicago Marriott for sale, Ms. Dowdy had not yet authorized the sale of the property.

37.  On February 23, 2018, following the execution of the settlement with JD Holdings, upon request of JD Holdings, Ms. Dowdy sent a letter to WHR and Mr. Kammerer as AJJ Co-Manager of WHR (the "February 23 Letter").  The February 23 Letter is attached as Exhibit D to the Complaint.

38.  In the February 23 Letter, Ms. Dowdy informed WHR and Mr. Kammerer that WHR was not authorized to enter into any binding or definitive agreement to sell the Chicago Marriott. Exhibit D at 1.

39.  On February 27, 2018, counsel for AJJ sent a letter to Ms. Dowdy in response to the February 23 Letter (the "February 27 Letter"), warning Ms. Dowdy that not authorizing the Chicago Marriott sale "may be a violation of your fiduciary duty to [WHR] and AJJ."  February 27 Letter, a true and correct copy of which is attached as Exhibit E to the Complaint, at 2.

40.  On February 27, 2018, in the AJJ Settlement Objection, AJJ objected to any "[d]elegation by Debtor Trust to JDH of any additional approvals or closing documents required to close any of the WHR Projects prior to plan confirmation."  AJJ Settlement Objection at 3.

41.  On February 28, 2018, at the hearing on the Settlement Motion, counsel for AJJ argued that Ms. Dowdy and Mr. Groves had breached their fiduciary duties to WHR and AJJ by delegating to JD Holdings the ability to say whether certain decisions should be made with

respect to WHR. Transcript of February 28, 2018 Hearing (the "Feb. 28 Transcript"), a true and correct copy of which is attached as Exhibit F to the Complaint, at 90:6-91:11.

2. The Lexington Hampton Inn Development

42. Prior to the execution of the Settlement Agreement between the Debtors and JD Holdings, WHR had planned to construct and develop a Hampton Inn in Lexington, Kentucky on ground leased to WHR's wholly-owned subsidiary by the University of Kentucky.

43. In the February 23 Letter, Ms. Dowdy informed WHR and Mr. Kammerer that WHR was not authorized to enter into any binding or definitive agreement begin construction on the Lexington Hampton Inn (the "Lexington Project"). Exhibit D at 1.

44. In the February 27 Letter, counsel for AJJ warned Ms. Dowdy that not authorizing the development of the Lexington Hampton Inn "may be a violation of your fiduciary duty to [WHR] and AJJ." Exhibit E at 2.

45. On February 27, 2018, in the AJJ Settlement Objection, AJJ objected to any "[d]elegation by Debtor Trust to JDH of any additional approvals or closing documents required to close any of the WHR Projects prior to plan confirmation." AJJ Settlement Objection at 3.

46. On February 28, 2018, at the hearing on the Settlement Motion, counsel for AJJ argued that Ms. Dowdy and Mr. Groves had breached their fiduciary duties to WHR and AJJ by delegating to JD Holdings the ability to say whether certain decisions should be made with respect to WHR. Feb. 28 Transcript at 90:6-91:11.

47. On March 12, 2018, counsel for AJJ sent a letter to counsel for the JQH Trust regarding several ongoing projects of WHR (the "March 12 Letter"). A true and correct copy of the March 12 Letter is attached as Exhibit G to the Complaint. In the March 12 Letter, with respect to the Lexington Project, AJJ states as follows:

11

Please note that AJJ has no interest in WHR at this time actively pursuing the Lexington Hampton/Embassy Suites transaction until the JQH Trust bankruptcy is finally resolved so that any request as to that proposition is moot.

Exhibit G at 2.

48. On June 1, 2018, AJJ apparently changed its position and sent a letter to Ms. Dowdy (the "June 1 Letter") requesting permission for WHR "to proceed with refinancing of the Lexington Marriott [sic] and development of the new Hampton Inn." June 1 Letter, attached as Exhibit H to the Complaint, at 2.

### E. The Appointment of Daniel S. Abrams as JQH Co-Manager

49. On June 6, 2018, in accordance with Section 9.1 of the Operating Agreement, Ms. Dowdy resigned as the JQH Co-Manager for WHR (the "Dowdy Resignation"). A true and correct copy the Dowdy Resignation is attached as Exhibit I to the Complaint.

50. On June 6, 2018, immediately following Ms. Dowdy's resignation, Ms. Dowdy and Mr. Groves, in their capacities as Co-Successor Trustees of the JQH Trust, and in accordance with Section 9.1 of the Operating Agreement, appointed Daniel S. Abrams ("Mr. Abrams") as the JQH Co-Manager for WHR (the "Abrams Appointment"). A true and correct copy of the Abrams Appointment is attached hereto as Exhibit J to the Complaint.

51. Mr. Abrams accepted the appointment on June 6, 2018 (the "Abrams Acceptance"). A true and correct copy of the Abrams Acceptance is attached as Exhibit K to the Complaint.

52. Thus, effective as of June 6, 2018, Mr. Abrams is and continues to be the valid JQH Co-Manager whose task, amongst many, is to represent the interests of the JQH Trust with respect to WHR business and thereby to protect the value of JQH Trust's property of the estate – its equity interest in WHR.

53. On June 7, 2018, Mr. Abrams sent a letter to Mr. Kammerer as AJJ Holdings Co-Manager and to AJJ notifying them of his appointment as JQH Co-Manager for WHR and

12

responding to several inquiries AJJ made to the Ms. Dowdy on June 1, 4, and 5, 2018 (the "June 7 Letter"). A true and correct copy of the June 7 Letter is attached as Exhibit L to the Complaint.

54. In the June 7 Letter, Mr. Abrams confirmed that the JQH Co-Manager of WHR did not authorize WHR to move forward with the sale of the Chicago Marriott or the development of the Lexington Hampton Inn for the reasons set forth in the June 7 Letter. Exhibit L at 2-3.

**F.     AJJ's Improper Attempts to Reject the Abrams Appointment**

55. On June 11, 2018, counsel for AJJ sent a letter to Ms. Dowdy and Mr. Groves accepting Ms. Dowdy's resignation as JQH Co-Manager and purportedly rejecting the appointment of Mr. Abrams as JQH Co-Manager (the "June 11 Letter"). A true and correct copy of the June 11 Letter is attached as Exhibit M to the Complaint.

56. The June 11 Letter incorrectly argues that Mr. Abrams cannot act as the JQH Co-Manager because "Mr. Abrams is a senior level officer and attorney at Atrium Holding Company ("Atrium"); Atrium is a direct competitor of WHR; and Atrium, through its affiliate [JD Holdings], has taken adverse action against Mr. Kammerer, AJJ and WHR in the past and currently has interests adverse to those of WHR and AJJ." June 11 Letter at 1.

57. The June 11 Letter incorrectly argues that the Ohio Revised Code prevents the JQH Co-Manager from being affiliated with or taking instructions from a competitor. June 11 Letter at 1.

58. Neither Atrium nor JD Holdings is a competitor of WHR.

59. Even if Atrium was a competitor or WHR, nothing in the Ohio Revised Code prevents Mr. Abrams from serving as JQH Co-Manager.

60. Even if Atrium or JD Holdings were competitors of WHR, nothing in the Ohio Revised Code prevents Mr. Abrams from serving as JQH Co-Manager.

13

61. Even if Atrium was a competitor or WHR, nothing in the Operating Agreement prevents Mr. Abrams from serving as JQH Co-Manager.

62. AJJ has no right to reject the appointment of Mr. Abrams as the JQH Co-Manager.

63. Moreover, the JQH Trust was as much a competitor of WHR as Atrium, and therefore, the course of dealing for WHR and its predecessors has always been that association with an entity that owns hotel properties is not a grounds to disqualify a person from being a co-manager; this course of dealing is consistent with the terms of the Operating Agreement which in no way prohibits such a person from serving as a co-manager of WHR.

64. On June 13, 2018, counsel for Mr. Abrams sent a letter to counsel for AJJ (the "June 13 Letter") explaining why AJJ has no right to reject Mr. Abrams' appointment as JQH Co-Manager and requesting that AJJ confirm in writing by June 14, 2018 that both AJJ and Mr. Kammerer "will abide by their obligations under the Operating Agreement and afford Mr. Abrams all of the rights and privileges to which the Operating Agreement entitles him as the JQH Co-Manager of WHR." June 13 Letter at 3. A true and correct copy of the June 13 Letter is attached as Exhibit N to the Complaint.

65. On June 14, 2018, counsel for AJJ sent a letter to counsel Ms. Dowdy and Mr. Groves, reiterating AJJ's position that it rejects the appointment of Mr. Abrams as JQH Co-Manager (the "June 14 Letter"). A true and correct copy of the June 14 Letter is attached as Exhibit O to the Complaint.

66. In the June 14, 2018, AJJ contends that, since Mr. Abrams is not the JQH Co-Manager, "WHR will only have one manager – Mike Kammerer." June 14 Letter at 3.

67. That assertion ignores the plain language of the Operating Agreement which states in relevant part that there "***shall always be two (2) Co-Managers***, one (1) Co-Manager representing

the then holder(s) of the JQH Membership Interest (the "JQH Co-Manager"), and the other single Co-Manager representing the then holder(s) of the AJJ Holdings Membership Interest." Operating Agreement § 9.1 (emphasis added).

68.  On June 18, 2018, counsel for Western & Southern Life Insurance Company, WS GP Airport Exchange, LLC and Eagle Realty Investments, Inc. (collectively, the "W&S Parties") sent a letter to Mr. Abrams regarding a pending sale of a hotel located in Cincinnati, Ohio in which WHR holds a minority interest (the "June 18 Letter").  A true and correct copy of the June 18 Letter is attached as Exhibit P to the Complaint.

69.  In the June 18 Letter, the W&S Parties state that "[a]s an initial matter, it is not clear to us what, if any, authority you have to discuss on behalf of the Seller the sale process that W&S is currently pursuing, much less question its validity in the way that you have.  Although you identify yourself as the JQH Trust-appointed Co-Manager of [WHR], representatives of the WHR Co-Manager appointed by [AJJ] have advised our client that (i) you do not have the ability to speak on behalf of WHR . . . ."  June 18 Letter at 1.

70.  As a result of AJJ's incorrect and improper representations, Mr. Abrams has been unable to speak with or obtain information from the W&S Parties regarding a sale of an asset which sale will impact property of the JQH Trust's bankruptcy estate.

71.  AJJ continues to refuse to acknowledge Mr. Abrams as the JQH Co-Manager for WHR to the extreme detriment of the JQH Trust and such conduct directly and negatively affects the value of the JQH Trust's interest in WHR.  Moreover, the assertion that now the JQH Trust has no representative as a co-manager is a blatant attempt by AJJ to take control of property of the estate – namely JQH's ownership interest in WHR.

72.  On information and belief, AJJ and Mr. Kammerer have taken control of WHR and

15

are wrongfully operating the business of WHR as though Mr. Kammerer was the only manager of WHR.

### G. The Court Denies AJJ's Request for Stay Relief

73. On April 18, 2018, AJJ filed a Motion for Relief from Stay to Proceed with Arbitration Regarding All Matters Relating to W&H Realty, LLC (the "Stay Relief Motion") (ECF Doc. 2044).

74. In the Stay Relief Motion, AJJ requests that the Bankruptcy Court modify the automatic stay of 11 U.S.C. § 362(a) to, among other things:

> enable AJJ to initiate an arbitration proceeding in Hamilton County, Ohio, in accordance with the Operating Agreement to address all disputes between AJJ and Debtor Trust as to Debtor Trust's WHR Interest, including but not limited to:
>
> 4. Any claims for breach against Debtor Trust under the Operating Agreement that arose after May 18, 2018;
>
> . . .
>
> 6. Any damages and costs to AJJ and/or WHR as a result of Debtors' actions.

Stay Relief Motion at 12-13.

75. On May 14, 2018, the Court held a hearing on the Stay Relief Motion. AJJ, the Debtors and JD Holdings each appeared at the hearing and argued the issues to the Bankruptcy Court. The Court denied the Stay Relief Motion on the record at the hearing.

### H. AJJ Violates the Stay and the Plan Injunction

76. Despite the Court's denial of the Stay Relief Motion, on June 21, 2018, AJJ filed a lawsuit against Jacqueline A. Dowdy, in her asserted capacity as Co-Manager of WHR, and Jacqueline A. Dowdy and Greggory D. Groves, in their capacities as Co-Successor Trustees of the JQH Trust (collectively, the "Released Defendants") along with defendant WHR in the Court of Common Pleas of Hamilton County, Ohio, entitled *JWJ Hotel Holdings Inc. f/k/a AJJ Hotel*

16

*Holdings, Inc. v. W&H Realty, LLC et al.*, Case No. A1803093 (the "AJJ Action"). A true and correct copy of the Complaint commencing the AJJ Action (the "AJJ Complaint") is attached as Exhibit Q to the Complaint.

77. In the AJJ Action, AJJ filed a Motion for Ex Parte Temporary Restraining Order and Appointment of a Receiver for Limited Purposes (the "Receiver Motion"). A true and correct copy of the Receiver Motion is attached as Exhibit R to the Complaint.

78. In the Receiver Motion, AJJ sought the entry of an order appointing a receiver for WHR, thereby removing from the JQH Trust its right to manage WHR.

79. On July 6, 2018, the JQH Trust removed the AJJ Action to the United States District Court for the Southern District of Ohio (the "Ohio District Court") and immediately sought to transfer the AJJ Action to this Court by filing a Motion to Transfer Venue, a true and correct copy of which is attached as Exhibit S to the Complaint (the "Motion to Transfer"). The Motion to Transfer is still pending in the Ohio District Court.

80. On July 13, 2018, AJJ filed a Motion for Preliminary and Permanent Injunction and for Limited Appointment of a Receiver With Affidavit in Support, a true and correct copy of which is attached as Exhibit T to the Complaint (the "Injunction Motion").

81. In the Injunction Motion, AJJ seeks the entry of both a preliminary and permanent injunction enjoining the JQH Trust from appointing Mr. Abrams as the JQH Co-Manager, thereby exercising control over the JQH Trust's management rights in WHR. AJJ also continues its request for an appointment of a receiver for WHR.

82. The JQH Trust files this motion to prevent AJJ and Mr. Kammerer from continuing to exercise control over the JQH Trust's interest in WHR and violating the Plan Injunction.

17

## ARGUMENT

83. The Defendants' actions show that the clear intent of AJJ is to strip the JQH Trust of its rights under the Operating Agreement, reduce the value of the JQH Trust's interest in WHR, and threaten to put completion of the Plan at risk. These efforts to exercise control over the JQH Trust's interest in WHR violate the automatic stay under § 362(a)(3) of the Bankruptcy Code. Even worse, the actions of AJJ and Mr. Kammerer, including but not limited to the AJJ Action, violate the express terms of the Plan Injunction, which is binding on the Defendants. The Court should stop the Defendants from violating the stay and the Plan Injunction by issuing a temporary restraining order for fourteen days, followed by the entry of a preliminary injunction, in each case barring the Defendants from proceeding in the AJJ Action, refusing to recognize Mr. Abrams as the JQH Co-Manager, or otherwise exercising control over the JQH Trust's management rights in WHR.

## I. THE JQH TRUST'S INTEREST IN WHR – INCLUDING ITS MANAGEMENT RIGHTS – ARE PROPERTY OF THE ESTATE

84. As of the Commencement Date, the JQH Trust's ownership interest in WHI and W&H was property of the JQH Trust's bankruptcy estate under § 541(a) of the Bankruptcy Code. This Court has already decided that, after the WHR Restructuring, the JQH Trust's ownership interest in WHR remained property of the JQH Trust's bankruptcy estate. May 14 Transcript at 70:25-71:6. Accordingly, there is no question that the JQH Trust's interest in WHR is property of the estate.

85. Both the JQH Trust's economic and non-economic rights in WHR, including its management rights, are property of the estate. *See Shin v. Altman (In re Altman)*, 2018 WL 3133164, at *5-6 (B.A.P. 9th Cir. Jun. 26, 2018) (individual debtor's right to manage a non-debtor limited liability company was property of the debtor's bankruptcy estate); *Fursman v.*

18

*Ulrich (In re First Protection, Inc.)*, 440 B.R. 821, 830 (B.A.P. 9th Cir. 2010) ("We conclude that all of the Debtor's [members] contractual rights and interest in Redux [LLC] became property of the estate under § 541(a) by operation of law when they filed their petition."); *In re Tarkanian*, 562 B.R. 424, 455 (Bankr. D. Nev. 2014) ("[B]oth the member's economic and non-economic interests become property of the bankruptcy estate and the bankruptcy trustee may exercise the management rights, if any, that the debtor has in the limited liability company."); *Caymus Ventures, LLC v. Jundanian (In re Jundanian)*, Adv. No. 11-00185, 2012 WL 1098544, at *5-6 (Bankr. D. Md. Mar. 30, 2012) (concluding that the member's voting and management rights are property of the estate); *Sheehan v. Warner (In re Warner)*, 480 B.R. 641, 653 (Bankr. W. Va. 2012) (same); *Klingerman v. ExecuCorp LLC (In re Klingerman)*, 388 B.R. 677, 679 (Bankr. E.D.N.C. 2008) (same).

86. This is consistent with the myriad of cases holding that a trustee or debtor-in-possession succeeds to both the economic and management rights held by the debtor. *See, e.g.*, *In re Albright*, 291 B.R. 538 (Bankr. D. Colo. 2003); *Schwartzer v. Cleveland (In re Cleveland)*, 519 B.R. 304 (D. Nev. 2014); *In re Mondanlo*, 412 B.R. 715 (Bankr. D. Md. 2006); *In re B & M Land & Livestock, LLC*, 498 B.R. 262 (Bankr. D. Nev. 2013); *Fursman v. Ulrich (In re First Protection, Inc.)*, 440 B.R. 821 (B.A.P. 9th Cir. 2010); *In re A-Z Elecs., LLC*, 350 B.R. 886 (Bankr. D. Idaho 2006); *In re Pickel*, 487 B.R. 289 (Bankr. D. N.M. 2013).

87. Thus, the JQH Trust's right to appoint a JQH Co-Manager and its right to have the JQH Co-Manager represent the JQH Trust's interest in the operating of WHR are property of the estate under § 541(a) of the Bankruptcy Code.

## II. AJJ AND MR. KAMMERER'S ACTIONS VIOLATE THE AUTOMATIC STAY UNDER SECTION 362(a)(3) OF THE BANKRUPTCY CODE

88. The actions of AJJ and Mr. Kammerer are preventing the JQH Trust from exercising

141356438.6

its management rights in the operation of WHR's business. Case law holds that attempts to take control of or diminish a debtor's governance rights over a non-debtor entity violate the automatic stay of § 362(a)(3) of the Bankruptcy Code. For example, in *Edisto Resources Corp. v. McConkey (In re Edisto Resources Corp.)*, 158 B.R. 954 (Bankr. D. Del. 1993), the debtor owned 80% of a non-debtor entity and a controlling number of the directors of the non-debtor entity were officers of the debtor. Thus, before the bankruptcy case, the debtor controlled the non-debtor entity. After the petition date, directors unrelated to the debtor sought the appointment of a receiver for the non-debtor entity, the result of which would have been to substitute the receiver for the directors of the non-debtor entity and thereby eliminate the debtor's ability to control the non-debtor. The bankruptcy court held the request for a receiver violated § 362(a)(3) of the Bankruptcy Code because the right to manage and control the non-debtor entity was property of the estate. *Id*. at 956-57. *Accord In re Altman*, 2018 WL 313164 at * 5-6; *Colonial Realty Co. v. River Bank of America (In re Colonial Realty Co.)*, 122 B.R. 1, 4-5 (Bankr. D. Conn. 1990); *In re Bicoastal Corp.*, 1989 WL 607352 at *6 (Bankr. M.D. Fla. Nov. 21, 1989). This is consistent with decisions holding that exercise of control over a debtor's non-economic rights violated the automatic stay. *See In re McCabe*, 345 B.R. 1, 7 (D.Mass.2006) (a non-debtor member amending a LLC agreement post-petition to reallocate the debtor's membership interest violates the automatic stay); *In re Daugherty Const., Inc.*, 188 B.R. 607, 615 (Bankr.D.Neb.1995) (LLC members voting post-petition to remove the debtor as manager and approving a new manager are actions that amount to "exercise of control over property of the estate and in violation of the automatic stay provisions" under 11 U.S.C. § 362(a)(3)); *In re Plunkett*, 23 B.R. 392, 394 (Bankr. E.D. Wisc. 1982). The automatic stay is violated "where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor

20

would have the legal effect of diminishing or eliminating property of the bankrupt estate." *Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines, Inc.)*, 928 F. 2d 565, 574 (2nd Cir. 1991), *cert. denied sub nom. PSS Co. v. Official Committee of Unsecured Creditors*, 501 U.S. 821 (1991); *See also In re 48th Street Steakhouse, Inc.*, 835 F. 2d 427, 431 (2nd Cir. 1987), *cert. denied sub nom. Rockefeller Group, Inc. v. 48th Street Steakhouse, Inc.*, 485 U.S. 1035 (1988). Furthermore, even where a court permitted a secured creditor to foreclose on a stock pledge and become an owner of the debtor, the Court reserved the right to enjoin the creditor from interfering with the debtor's reorganization process. *Official Bondholders Committee v. Chaswe Manhattan Bank (In re Marvel Entertainment Group, Inc.)*, 209 B.R. 832, 840 (D. Del. 1997).

89. Specifically, a request for appointment of a receiver over an LLC in which the debtor holds management rights is an act to exercise control over property of the estate. *See Edisto*, 158 B.R. at 957; *Colonial Realty Co.*, 122 B.R. at 4-5. The actions of AJJ and Mr. Kammerer are clear violations of the automatic stay because they are exercising control over the JQH Trust's rights in WHR.

## III.    AJJ AND MR. KAMMERER'S ACTIONS VIOLATE THE PLAN INJUNCTION

90. The Plan provides a broad exculpation provision that permanently enjoins the Defendants from taking the following actions against and Exculpated Party:

> any act taken or not taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Disclosure Statement, Plans, Confirmation, Plans Transactions, the Plans, or any Plan Documents or other agreement, document, instrument or release created or entered into in connection with the Plans . . . or (iv) any other prepetition or post-petition act taken or not taken in connection with, or related to, the restructuring of the Debtor.

Plan at Art. VIII.E.

91. Ms. Dowdy and Mr. Groves, both individually and in the capacities in which AJJ has

141356438.6

sued them in the AJJ Action, are each an Exculpated Party under the Plan. "'Exculpated Parties' means the Debtors Released Parties, the JD Holdings Released Parties, and the Trustees Released Parties." Plan at Art. I.A. § 45. "'Trustees Release Party' means Greggory Groves and Jacqueline A. Dowdy, individually and in their representative capacities as co-successor trustees of the JQH Trust, officers, directors, general counsel, managers, representatives, agents, and employees of any Debtors and JQH Non-Debtor Entities." Plan at Art. I.A. § 86.

92. The Plan Exculpation includes Ms. Dowdy in her asserted capacity as JQH Co-Manager of WHR. "'JQH Non-Debtor Entities' means those Entities listed on Schedule 2." Plan at Art. I.A. § 55. WHR is listed as a JQH Non-Debtor Entity on Schedule 2. *See* Plan at 40.

93. Each of the acts Ms. Dowdy or Mr. Groves took that forms the basis for the claims asserted in the AJJ Action were in an effort to implement and effectuate the Plan and the Plan Transactions, specifically, the transfer of the JQH Trust's in WHR to JD Holdings and the transfer of all economic benefits of the JQH Trust's in WHR to JD Holdings, which occurred on the Effective Date.

94. Moreover, the alleged claims for breach of fiduciary duty set forth in the AJJ Action would have arisen, if at all, on February 23, 2018, when Ms. Dowdy sent the Feb. 23 Letter informing WHR and AJJ that she did not authorize the sale of the Chicago Marriott or the development of the Lexington Hampton Inn. *See Hirschi v. Evans*, 1996 WL 146090, at *3 (Ohio Ct. App. Mar. 27, 1996) (a breach of fiduciary duty claim under Ohio law arises " when the act or commission constituting the breach of fiduciary duty occurred."); *Investors REIT One v. Jacobs,* 46 Ohio St. 3d 176, 182 (1989) (same). Because these claims arose, if at all, prior to the confirmation of the Plan, they clearly fall within the scope of the Plan Injunction.

95. The Plan Exculpation is a central and fundamental element of the Confirmation

141356438.6

Order.  *See Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (endorsing the findings of the bankruptcy court concerning the propriety of and justification for the exculpation provisions contained in debtor's chapter 11 plan); *see also In re CIT Group, Inc.*, 2009 WL 4824498, at *12 (Bankr. S.D.N.Y. Dec. 8, 2009) (approving debtor's chapter 11 plan and finding that "each of the discharge, release, injunction, indemnification and exculpation provisions . . . is an essential means of implementing the Plan . . . an integral element of the transactions incorporated in the Plan . . . [and] important to the overall objectives of the Plan . . .").

96.  Courts enjoin entities or persons from taking actions that violate a confirmed plan's exculpation provisions.  *See, e.g., In re Orleans Homebuilders, Inc.*, 561 B.R. 46, 55 (Bankr. D. Del. 2016) (holding that post-confirmation lawsuit brought by homeowner's association against the debtor was barred by the plan's exculpation provision); *In re Peabody Energy Corp.*, 2017 WL 4843724, at *8-9 (Bankr. E.D. Mo. Oct. 24, 2017).

97.  Here, the actions of the Defendants including, most importantly, the commencement and prosecution by AJJ of the AJJ Action, the Receiver Motion and the Injunction are violations of the Plan Injunction entered by this Court.  The Defendants should not be permitted to continue their subversive attacks on the JQH Trust and its interest in WHR.  These actions are frustrating the efforts of the Debtors and JD Holdings to complete the transactions approved in the Plan, all in violation of an order of this Court.

## IV.    THE DEFENDANTS MUST BE RESTRAINED AND THEN ENJOINED FROM VIOLATING THE AUTOMATIC STAY AND THE PLAN INJUNCTION

98.  Given the pending Receiver Motion and Injunction Motion in the AJJ Action, unless the Defendants are immediately and temporarily restrained from proceeding, the JQH Trust could suffer immediate and irreparable harm as it will have to defend itself in the litigation and

23

potentially suffer an adverse ruling that would deprive the JQH Trust of its right to manage WHR and put in place a receiver who may take actions, such as selling property or entering into long-term contracts that would irreparably harm WHR, and therefore the JQH Trust. Any further proceeding at this time in the AJJ Action could trigger each of these consequences and as a result, will irreparably harm the JQH Trust. Thus, the Court should enter a temporary restraining order immediately and restrain the Defendants from proceeding against the JQH Trust pending a hearing on the request for a preliminary injunction.

99. To the extent applicable, the injunction factors analyzed hereafter support entry of a temporary restraining order. Each of the factors necessary for issuance of a preliminary injunction and the enforcement of the automatic stay are present.

### A. Substantial Likelihood of Success on the Merits

100. As set forth above, the JQH Trust has a substantial likelihood of proving that the Defendants have violated the automatic stay by exercising control over the JQH Trust's interest in WHR. The law is clear that the JQH Trust's management rights in WHR are property of the JQH Trust's bankruptcy estate and there can be no dispute that the Defendants have deprived the JQH Trust of its ability to exercise its management rights in WHR. The JQH Trust has a substantial likelihood of proving that the Defendants have violated the Plan Injunction as well. The plain language of the Plan Injunction and the Plan Exculpation permanently enjoins the Defendants from taking the very actions that are the subject of the Complaint and this motion. Accordingly, the JQH Trust submits that this factor weighs strongly in favor of granting the relief requested herein.

### B. Irreparable Harm Will Be Suffered in the Absence of the Injunction

101. In the absence of restraining order and then an injunction, the AJJ Action will

proceed forward and, if the Ohio District Court does not transfer the AJJ Action to this Court, the Ohio District Court will rule on the Receiver Motion and the Injunction Motion. An adverse ruling on either motion will remove the JQH Trust from management of WHR without an order of this Court.

102. In short, the AJJ Action directly and substantially invades this Court's exclusive jurisdiction over property of the estate pursuant to 28 U.S.C. § 1334(e) and this Court's retention of jurisdiction to enforce the Confirmation Order.

103. Failure to grant the requested injunction will additionally prejudice the JQH Trust by: (i) forcing the JQH Trust to devote substantial attention to the AJJ Action instead of completing the remaining actions necessary to complete the Plan; (ii) forcing the JQH Trust to incur the time, effort and expense of participating in the AJJ Action in order to avoid the potentially permanent loss of the JQH Trust's management rights in WHR; (iii) subjecting the JQH Trust to inconsistent rulings by the Ohio District Court and this Court; and (iv) selling WHR's assets or encumbering WHR against wishes of the JQH Trust.

104. As a result, the continuation of the AJJ Action will substantially and possibly irreparably damage the JQH Trust.

**C.     The Defendants Will Not Be Harmed by the Injunction And Any Alleged Harm is Outweighed By the Threatened Injury to the JQH Trust**

105. The requested injunction will not materially prejudice the Defendants because: (i) the injunction will merely preserve the status quo as to all the parties in the AJJ Action; and (ii) it is impermissible for the Defendants to seek rulings in the AJJ Action that will in any way affect the property of the estate and completion of the Plan. The Defendants will not be harmed by this Court's entry of an order enjoining the Defendants from violating this Court's prior injunction.

**D.     The Injunction Will Not Adversely Affect the Public Interest**

141356438.6

106. Finally, granting the requested relief is in the public interest by: (i) promoting the completion of a successful chapter 11 Plan; (ii) avoiding piecemeal litigation before the Ohio District Court; (iii) protecting against the Defendants' exercise of control over property of the estate over which this Court has exclusive jurisdiction under 28 U.S.C. § 1334(e); and (iv) protecting against the Defendants' continued violations of the Confirmation Order entered by this Court.

## CONCLUSION

107. For the reasons set forth herein, the JQH Trust requests that the Court: (i) enter an order and thereby temporarily restrain the Defendants from proceeding in the Ohio District Court for up to fourteen days and, prior to the expiration of the temporary restraining order; (ii) issue a preliminary injunction to enjoin the Defendants from further proceedings in the Ohio District Court, pending further order of this Court; (iii) rule that prosecution of the pending litigation in the Ohio District Court violates § 362(a)(3) of the Bankruptcy Code and the Plan Injunction; and (iv) enforce the automatic stay and the Plan Injunction against the Defendants to prevent their continuing attempts to exercise of control over property of the JQH Trust's bankruptcy estate.

Respectfully submitted,

STINSON LEONARD STREET LLP

By:  /s/ Nicholas J. Zluticky
Mark Shaiken KS # 11011
Nicholas Zluticky KS # 23935
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
mark.shaiken@stinson.com
nicholas.zluticky@stinson.com

*Counsel for Plaintiff*

26

141356438.6